Michael R. Lozeau (State Bar No. 142893)
Victoria A. Yundt (State Bar No. 326186)
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
E-mail: michael@lozeaudrury.com
       victoria@lozeaudrury.com

Barak J. Kamelgard (State Bar No. 298822)
Benjamin A. Harris (State Bar No. 313193)
LOS ANGELES WATERKEEPER
360 E 2nd St., Suite 250
Los Angeles, CA 90012
Tel: (310) 394-6162
E-mail: barak@lawaterkeeper.org
       ben@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California nonprofit corporation,<br><br>     Plaintiff,<br><br>  vs.<br><br>U.S. BORAX INC., a Delaware corporation,<br><br>     Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

LOS ANGELES WATERKEEPER ("LA Waterkeeper" or "Plaintiff"), a

California nonprofit corporation, by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On February 7, 2023, Plaintiff provided notice of Defendant U.S. BORAX INC.'s ("U.S. Borax" or "Defendant") violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of LA Waterkeeper's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is

diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.    INTRODUCTION

5.      This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility located at 300 Falcon Street in Wilmington, California, 90744 ("Facility"). These discharges and related procedural, planning, and reporting omissions are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as renewed by Water Quality Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ on August 4, 2015, and further amended on November 6, 2018 ("General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.      With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for a significant portion of the total pollution entering surface waters each year.

7.      The Los Angeles/Long Beach Inner Harbor ("Inner Harbor") and Los Angeles/Long Beach Outer Harbor ("Outer Harbor") area waters (collectively, the "Greater Harbor Waters") are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Los Angeles area waters have for people in the surrounding communities. The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreation and aesthetic opportunities, such as wildlife observation are also impaired by polluted discharges into Los Angeles area waters.

8.      The Inner Harbor is impaired with, among other pollutants, excessive toxicity and zinc. The Outer Harbor is impaired with, among other pollutants, excessive toxicity. Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of the Greater Harbor Waters and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III.   PARTIES

9.      Plaintiff LOS ANGELES WATERKEEPER is a nonprofit public benefit corporation organized under the laws of the State of California with its main office in Los Angeles, California. Founded in 1993, LA Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal surface and groundwaters of Los Angeles County from all sources of pollution and degradation. LA Waterkeeper

and its members are deeply concerned with protecting the environment in and around their communities, including the Greater Harbor Waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

10.    LA Waterkeeper has members living in the communities near the Facility and Greater Harbor Waters. Members of LA Waterkeeper use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause pollutants to be discharged. Members of LA Waterkeeper use those areas to recreate and view wildlife, among other activities. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

11.    LA Waterkeeper brings this action on behalf of its members. LA Waterkeeper's interest in reducing Defendant's discharges of pollutants into the Greater Harbor Waters and their tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of LA Waterkeeper.

12.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no

plain, speedy, or adequate remedy at law.

13.     Defendant U.S. BORAX INC. is a Delaware corporation that owns and/or operates the Facility located in Wilmington, California.

## IV.     STATUTORY BACKGROUND

### A. <u>Clean Water Act</u>

14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

16.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES

permit application. 40 C.F.R. § 122.21.

17.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**B. General Permit**

18.     The State Board elected to issue a statewide general permit for industrial storm water discharges ("General Permit"). The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. The State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). On November 6, 2018, the General Permit was further amended to include additional effluent limitations and numeric action levels to be applied to industrial permittees that discharge storm water to waters that have been identified as impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), including the Inner Harbor for zinc.

19.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

20.     The General Permit contains several prohibitions. Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

General Permit, § V.A. Discharge Prohibition III.B of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges or "NSWDs") that discharge either directly or indirectly to waters of the United States. General Permit, § III.B. Receiving Water Limitation VI.C and Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized NSWDs that cause or threaten to cause pollution, contamination, or nuisance. General Permit, §§ VI.C, III.C. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. General Permit, § VI.B. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. General Permit, §§ VI.A, III.D

21.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

22.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with

industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* General Permit, § X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X.B. Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit Fact Sheet, § I(1).

23.     Sections X.D-I of the General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of industrial materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges. The General Permit requires that all dischargers develop and implement a set of minimum BMPs (which are mostly non-structural BMPs) as well as any advanced BMPs (which are mostly structural) as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations. *See* General Permit, § X.H. The General Permit requires a comprehensive assessment of potential pollutant sources, specific BMP descriptions;

and a BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. *See* General Permit, §§ X.G.2, 4-5. Section X.E of the General Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

24.     The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *See* General Permit, § X.H.1. Failure to implement all of these minimum BMPs is a violation of the General Permit. *See* General Permit Fact Sheet, § I.2.o.

25.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*. The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. *See* General Permit, § X.H.4-5.

26.     A facility must "ensure that the SWPPP identifies and justifies each minimum BMP or applicable advanced BMP not being implemented at the facility

because they do not reflect best industry practice considering technological availability and economic practicability and achievability." General Permit, § X.H.4.b. A facility's SWPPP must also identify where the minimum BMPs in different areas of the facility will not adequately reduce the pollutants in the facility's storm water dischargers and identify advanced BMPs for those areas. General Permit, § X.G.2. A facility's BMPs must, at all times, be robust enough to meet the requirement of the General Permit and of 33 U.S.C. § 1342(p)(3)(A) that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit, §§ V.A, I.A.1, I.D.31-32.

27. The General Permit requires facility operators to develop and implement an adequate Monitoring Implementation Plan for visual observations and for the sampling and analysis of storm water discharges. *See* General Permit, §§ X.I, XI. The primary objective of such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. Adequate monitoring and reporting ensure that BMPs are effectively reducing and/or eliminating pollutants at a facility, and are evaluated and revised whenever appropriate to ensure compliance with the General Permit.

28. Under the General Permit, facilities must analyze storm water samples for total suspended solids, Oil & Grease, pH, "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, " "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed

impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code. General Permit, § XI.B.6.

29.     Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI.A. The General Permit requires each discharger to maintain records of all of the visual observations required by the Permit. General Permit, § XI.A.3.

30.     Section XI.B.2 of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30). Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge. General Permit, § XI.B. A sample must be collected from each discharge point at the facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period. General Permit, § XI.B.5.

31.     The General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location. General Permit, § XI.A.2. "The Discharger shall visually observe and record the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris, and source(s) of any discharged pollutants." General Permit, § XI.A.2.c.

32.     The General Permit requires operators to conduct an Annual

Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV. Per Section XV.F of the General Permit, a facility's Annual Evaluation must include "[a] review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs." General Permit, § XV.F. After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation." General Permit, § XV. The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year." General Permit § XVI.

33.     The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

34.     The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual Numeric Action Levels ("NALs") and instantaneous maximum NALs. General Permit, § XII.A. If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on July 1 following the reporting year during which the exceedance occurred. General Permit, § XII.C.

35.     By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation. General Permit, § XII.C.1. As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances." *Id.* No later than January 1 following commencement of Level 1 status, the Discharger must submit via the State Water Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") a Level 1 ERA Report. General Permit § XII.C.2. The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL." *Id.* A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter." *Id.*

**C. <u>Basin Plan</u>**

36.     The Regional Board has identified beneficial uses and established water quality standards for the Greater Harbor Waters, including the Inner and Outer Harbors, in the "Water Quality Control Plan, Los Angeles Region Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.

37.     The beneficial uses of these waters include, among others, industrial

service supply; navigation, including shipping, travel, or other transportation by private, military, or commercial vessels; commercial and sport fishing; marine habitat; habitat for rare, threatened, or endangered species, which use these waters for foraging and/or nesting; and non-contact water recreation. Non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." The potential beneficial uses of these waters also include, among others, water contact recreation and shellfish harvesting, either for human consumption, commercial, or sports purposes.

38.     Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

39.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

40.     The EPA has adopted saltwater numeric water quality standards for zinc of 0.09 mg/L (Criteria Maximum Concentration – "CMC"). 40 CFR § 131.38

(California Toxics Rule).[1]

41.     Plaintiff is informed and believes, and thereupon alleges, that studies have shown that boron concentrations in sea water of 10 mg/L or greater inhibit growth of marine phytoplankton and boron concentrations in sea water of 50 mg/L or greater inhibit growth of sea urchins. Guam has established a numeric water quality standard for boron in marine waters of 5.0 mg/L. Plaintiffs are informed and believe, and thereupon allege, that the U.S. Environmental Protection Agency has approved Guam's water quality standard for boron. Plaintiff is informed and believes, and thereupon alleges, that the boron standard established by Guam, and approved by EPA, is substantial evidence of a concentration level of boron necessary to protect beneficial uses of the Greater Harbor Waters.

42.     The EPA 303(d) List of Water Quality Limited Segments lists the Inner Harbor as impaired for DDT, Benthic Community Effects, PCBs, copper, toxicity, chrysene, benzo(a)pyrene, and zinc, and the Outer Harbor as impaired for DDT, PCBs, and toxicity. *See* Final 2018 California Integrated Report, Appendix A: 2018 303(d) List of Impaired Waters, *available at:* https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2018_integrated_report.html.

**D. Numeric Action Levels**

43.     The General Permit establishes annual NALs and instantaneous

---

[1] Criteria Maximum Concentration ("CMC") is the highest concentration of a pollutant to which aquatic life can be exposed for a short period of time without deleterious effects.

maximum NALs. The following annual NALs have been established under the General Permit for pollutants discharged by the Facility: zinc – 0.26 mg/L; nitrate and nitrite nitrogen ("N+N") – 0.68 mg/L; and iron – 1.0 mg/L.

44.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The General Permit also establishes an instantaneous maximum pH NAL of less than 6.0 or greater than 9.0 s.u. An instantaneous maximum pH NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year are outside of the instantaneous maximum NAL range for pH. General Permit, § XII.A.2.

45.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. General Permit, § XII.C. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit, § XII.D. For Level 2 Status, a discharger is required to submit an Exceedance Response Action ("ERA") Action Plan and an ERA Technical Report requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit, § XII.D.

46.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1)

and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $64,618 per day per violation for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See* 40 C.F.R. §§ 19.1 - 19.4.

V.   **STATEMENT OF FACTS**

47.    Defendant owns and/or operates the Facility, known as U.S. Borax Inc., that engages in the manufacturing, storage, and distribution of boron-based compounds used for a variety of applications including fire retardants, smoke suppressants, fertilizers, insecticides, fungicides, and wood preservatives.

48.    The Facility falls within Standard Industrial Classification ("SIC") Code 2819 ("Industrial Inorganic Chemicals, NEC").

49.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has operated the Facility since prior to February 7, 2018.

50.    Plaintiff is informed and believes, and thereupon alleges, that during or before 2015, Defendant filed a Notice of Intent enrolling the Facility in the General Permit.

51.    The Facility collects storm water from its approximately 9-acre industrial site and discharges storm water from at least ten discharge locations at the Facility. According to the Facility's SWPPP, as amended in December 2016 and June 2020, five drainage areas have been identified at the Facility which discharge storm water at the ten locations in a series of grated concrete boxes that discharge through below-grade pipelines to the Inner Harbor. The five drainage areas are storm water sampling

locations at the Facility and are referred to in the SWPPP as Drainage Areas A, B, C, D, and E. Drainage Area A includes discharge locations 1 through 3, which are located at the Facility's Dust Collector Railroad Track Area, Wharf Office, and Bulk Silo. Drainage Area B includes discharge locations 4 and 5, which are located at the Facility's Wooden Pallet and Bag Storage Area and Courtyard. Drainage Area C includes discharge location 6 and is located at the Facility's Courtyard and Roadway. Drainage Area D includes discharge locations 7 through 9, with discharge 7 located at the Facility's Deionized Water Treatment System Area and discharges 8 and 9 located at the Special Quality Plant. Drainage Area E includes discharge location 10 and is located at the Facility's Scrap Storage and Track Sump Area.

52.     Plaintiff is informed and believes, and thereupon alleges, that storm water associated with industrial activities discharges from underground storm drains at the Facility during rain events with daily precipitation of 0.1 inches or more.

53.     Plaintiff is informed and believes, and thereupon alleges, that storm water discharged from the Facility flows into underground storm drains that empty into the East Basin Channel of the Inner Harbor, which then flows into the Outer Harbor and ultimately flows to the Pacific Ocean.

54.     The East Basin Channel of the Inner Harbor is a water of the United States. The Inner Harbor is a water of the United States. The Outer Harbor is a water of the United States. The Pacific Ocean is a water of the United States.

55.     Plaintiff is informed and believes, and thereupon alleges, that storm water flows over the surface of the Facility where industrial activities occur, including activities associated with the manufacturing, storage, disposal, and distribution of

boron-based compounds used for a variety of applications including fire retardants, smoke suppressants, fertilizers, insecticides, fungicides, and wood preservatives.

56.     Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects particulates, metals including zinc and iron, metalloids including boron, inorganic compounds including N+N, and other pollutants as it flows towards the storm water discharge locations at the Facility.

57.     Plaintiff is informed and believes, and thereupon alleges that all storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

58.     Plaintiff is informed and believes, and thereupon alleges, that there are insufficient structural storm water control measures installed at the Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States. The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

59.     Since and prior to February 7, 2018, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility. The sample results were submitted to the State Board via SMARTS.

60.     In the storm water sampling results submitted to the State Board since March 18, 2018, the Facility has reported high pollutant levels from its storm water sampling results. Based on the Facility's storm water sampling results, Plaintiff is

informed and believes, and thereupon alleges, that Defendant has discharged and continues to discharge storm water with unacceptable levels of zinc, N+N, iron, and boron.

61.     Since March 18, 2018, the Facility has reported discharges of storm water containing pollutants in excess of applicable NALs for zinc, N+N, and iron. These discharges of pollutants from the Facility have violated Discharge Prohibitions III.A, III.B, III.C, and III.D and Receiving Water Limitations VI.A, VI.B, and VI.C of the General Permit and are evidence of ongoing violations of Effluent Limitation V.A of the General Permit.

62.     During the 2018-2019 reporting year, the levels of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On November 29, 2018, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 2.23 mg/L, 3.78 mg/L, 15.6 mg/L, and 2.03 mg/L, respectively. On December 5, 2018, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, D, and E at the Facility were 1.67 mg/L, 3.4 mg/L, 9.62 mg/L, 1.76 mg/L, and 5.47 mg/L, respectively. On January 7, 2019, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.687 mg/L, 1.57 mg/L, 5.17 mg/L, and 0.618 mg/L, respectively. On January 31, 2019, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, D, and E at the Facility were 1.15 mg/L, 2.89 mg/L, 4.16 mg/L, 0.78 mg/L, and 7.63 mg/L, respectively. The average of all zinc measurements in storm water at the Facility during the 2018-2019 reporting year was 3.90 mg/L. 3.90 mg/L of zinc exceeds 0.26

mg/L of zinc.

63. During the 2019-2020 reporting year, the levels of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On November 20, 2019, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.24 mg/L, 8.48 mg/L, 7.44 mg/L, and 4.26 mg/L, respectively. On November 27, 2019, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.47 mg/L, 3.55 mg/L, 6.68 mg/L, and 1.3 mg/L, respectively. On January 17, 2020, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.302 mg/L, 3.16 mg/L, 11.5 mg/L, and 0.898 mg/L, respectively. On March 10, 2020, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.318 mg/L, 1.28 mg/L, 8.32 mg/L, and 1.2 mg/L, respectively. On March 12, 2020, the level of zinc in storm water collected by the Defendant from Drainage Area E at the Facility was 3.82 mg/L. The average of all zinc measurements in storm water at the Facility during the 2019-2020 reporting year was 3.84 mg/L. 3.84 mg/L of zinc exceeds 0.26 mg/L of zinc.

64. During the 2020-2021 reporting year, the levels of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On December 28, 2020, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 2.02 mg/L, 6.6 mg/L, 12.1 mg/L, and 5.61 mg/L, respectively. On January 25, 2021, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.631

mg/L, 2.05 mg/L, 6.2 mg/L, and 1.56 mg/L, respectively. On January 28, 2021, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.903 mg/L, 1.44 mg/L, 7.74 mg/L, and 2.93 mg/L, respectively. The average of all zinc measurements in storm water at the Facility during the 2020-2021 reporting year was 4.15 mg/L. 4.15 mg/L of zinc exceeds 0.26 mg/L of zinc.

65. During the 2021-2022 reporting year, the levels of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On December 14, 2021, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.317 mg/L, 1.32 mg/L, 15.9 mg/L, and 5.06 mg/L, respectively. On December 23, 2021, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.5 mg/L, 3.77 mg/L, 0 mg/L, and 0 mg/L, respectively. On March 28, 2022, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.69 mg/L, 1.74 mg/L, 7.83 mg/L, and 1.76 mg/L, respectively. The average of all zinc measurements in storm water at the Facility during the 2021-2022 reporting year was 4.09 mg/L. 4.09 mg/L of zinc exceeds 0.26 mg/L of zinc.

66. During the 2022-2023 reporting year, the levels of zinc in storm water detected at the Facility have exceeded the annual NAL for zinc of 0.26 mg/L. On November 8, 2022, the levels of zinc in storm water collected by the Defendant from Drainages Areas A, B, C, and D at the Facility were 1.25 mg/L, 62 mg/L, 11.4 mg/L, and 21.4 mg/L, respectively. On December 11, 2022, the levels of zinc in storm water

collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.76 mg/L, 2.52 mg/L, 13.5 mg/L, and 1.85 mg/L, respectively. On January 9, 2023, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 2.49 mg/L, 37.1 mg/L, 5.72 mg/L, and 9.64 mg/L, respectively. On January 30, 2023, the levels of zinc in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.817 mg/L, 1.61 mg/L, 5.86 mg/L, and 2.24 mg/L, respectively. The average of all zinc measurements of storm water at the Facility during the 2022-2023 reporting year to date is 11.3 mg/L. 11.3 mg/L of zinc exceeds 0.26 mg/L of zinc.

67.     The levels of zinc in storm water detected by the Facility during the 2018-2019, 2019-2020, 2020-2021, and 2021-2022 reporting years have exceeded the saltwater numeric water quality standard for zinc of 0.09 mg/L (CMC) established by EPA in the California Toxic Rule.

68.     During the 2018-2019 reporting year, the levels of N+N in storm water detected at the Facility exceeded the annual NAL for N+N of 0.68 mg/L. On November 29, 2018, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.3 mg/L, 2.8 mg/L, 0.45 mg/L, and 0.098 mg/L, respectively. On December 5, 2018, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, D, and E at the Facility were 1.2 mg/L, 0.47 mg/L, 0.81 mg/L, 0.53 mg/L, and 0.38 mg/L, respectively. On January 7, 2019, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.5 mg/L, 0.74 mg/L, 0.5 mg/L, and 0.34 mg/L, respectively. On January 31, 2019, the levels of N+N

in storm water collected by the Defendant from Drainage Areas A, B, C, D, and E at the Facility were 0.72 mg/L, 0.6 mg/L, 0.19 mg/L, 0.096 mg/L, and 0.076 mg/L, respectively. The average of all N+N measurements of storm water at the Facility during the 2018-2019 reporting year was 0.71 mg/L. 0.71 mg/L of N+N exceeds 0.68 mg/L of N+N.

69.     During the 2019-2020 reporting year, the levels of N+N in storm water detected at the Facility exceeded the annual NAL for N+N of 0.68 mg/L. On November 20, 2019, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 3.42 mg/L, 17.9 mg/L, 3.16 mg/L, and 0.831 mg/L, respectively. On November 27, 2019, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 4.7 mg/L, 3.15 mg/L, 2 mg/L, and 0.554 mg/L, respectively. On January 17, 2020, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.647 mg/L, 0.716 mg/L, 0.488 mg/L, and 0.225 mg/L, respectively. On March 10, 2020, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.565 mg/L, 1.72 mg/L, 0.922 mg/L, and 0.576 mg/L, respectively. On March 12, 2020, the level of N+N in storm water collected by the Defendant from Drainage Area E at the Facility was 0.579 mg/L. The average of all N+N measurements of storm water at the Facility during the 2019-2020 reporting year was 2.60 mg/L. 2.60 mg/L of N+N exceeds 0.68 mg/L of N+N.

70.     During the 2020-2021 reporting year, the levels of N+N in storm water detected at the Facility exceeded the annual NAL for N+N of 0.68 mg/L. On

December 28, 2020, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 4.82 mg/L, 2.83 mg/L, 0.911 mg/L, and 0.886 mg/L, respectively. On January 25, 2021, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.89 mg/L, 0.565 mg/L, 0.86 mg/L, and 0.47 mg/L, respectively. On January 28, 2021, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.23 mg/L, 0.826 mg/L, 0.999 mg/L, and 0.303 mg/L, respectively. The average of all N+N measurements in storm water at the Facility during the 2020-2021 reporting year was 1.38 mg/L. 1.38 mg/L of N+N exceeds 0.68 mg/L of N+N.

71.     During the 2021-2022 reporting year, the levels of N+N in storm water detected at the Facility exceeded the annual NAL for N+N of 0.68 mg/L. On December 14, 2021, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 3.53 mg/L, 0.79 mg/L, 0.622 mg/L, and 0.0874 mg/L, respectively. On December 23, 2021, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.6 mg/L, 1.47 mg/L, 1.42 mg/L, and 0.419 mg/L, respectively. On March 28, 2022, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.873 mg/L, 0.238 mg/L, 0.446 mg/L, and 0.266 mg/L, respectively. The average of all N+N measurements of storm water at the Facility during the 2021-2022 reporting year was 0.98 mg/L. 0.98 mg/L of N+N exceeds 0.68 mg/L of N+N.

72.     During the 2022-2023 reporting year, the levels of N+N in storm water

detected at the Facility have exceeded the annual NAL for N+N of 0.68 mg/L. On November 8, 2022, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 2.46 mg/L, 2.7 mg/L, 1.15 mg/L, and 0.239 mg/L, respectively. On December 11, 2022, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 2.36 mg/L, 2.41 mg/L, 0.828 mg/L, and 0.525 mg/L, respectively. On January 9, 2023, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.857 mg/L, 0.783 mg/L, 0.271 mg/L, and 0.617 mg/L, respectively. On January 30, 2023, the levels of N+N in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0.884 mg/L, 0.568 mg/L, 0.557 mg/L, and 0.472 mg/L, respectively. The average of all N+N measurements of storm water at the Facility during the 2022-2023 reporting year to date is 1.1 mg/L. 1.1 mg/L of N+N exceeds 0.68 mg/L of N+N.

73.     During the 2019-2020 reporting year, the levels of iron in storm water detected at the Facility exceeded the annual NAL for iron of 1.0 mg/L. On November 20, 2019, the levels of iron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were all 0 mg/L. However, the method detection limit ("MDL") of the analytical method used for the November 20, 2019 samples was 9.26 mg/L. On November 27, 2019, the levels of iron in storm water collected by the Defendant from Drainage Areas A, C, and D at the Facility were each 0 mg/L, while the level of iron in storm water collected by the Defendant from the Facility's Drainage Area B was 10.4 mg/L. The MDL of the analytical method used for the November 27, 2019 samples was 9.26 mg/L. On January 17, 2020, the levels of iron

in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.1 mg/L, 2.04 mg/L, 1.49 mg/L, and 0.132 mg/L, respectively. On March 10, 2020, the levels of iron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.67 mg/L, 4.37 mg/L, 1.19 mg/L, and 0.545 mg/L, respectively. On March 12, 2020, the level of iron in storm water collected by the Defendant from Drainage Area E at the Facility was 0 mg/L. The average of all iron measurements taken at the Facility during the 2019-2020 reporting year was 1.35 mg/L. 1.35 mg/L of iron exceeds 1 mg/L of iron.

74.     During the 2021-2022 reporting year, the levels of iron in storm water detected at the Facility exceeded the annual NAL for iron of 1.0 mg/L. On December 14, 2021, the levels of iron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0 mg/L, 1.32 mg/L, 1.57 mg/L, and 1.71 mg/L, respectively. The MDL of the analytical method used for the December 14, 2021 samples was 1.11 mg/L. On December 23, 2021, the levels of iron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 0 mg/L, 1.47 mg/L, 1.23 mg/L, and 0 mg/L, respectively. The MDL of the analytical method used for the December 23, 2021 samples was 1.11 mg/L. On March 28, 2022, the levels of iron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1.75 mg/L, 1.49 mg/L, 1.27 mg/L, and 1.32 mg/L, respectively. The average of all iron measurements of storm water at the Facility during the 2021-2022 reporting year was 1.09 mg/L. 1.09 mg/L of iron exceeds 1 mg/L of iron.

75.     The Facility has reported discharges of storm water containing boron that

have greatly exceeded the level of boron demonstrated by various biological studies to cause adverse effects to marine aquatic life, including, *inter alia*, marine algae, phytoplankton, and sea urchins. Since November 29, 2018, the Facility has reported discharges of storm water contaminated with boron at levels in excess of 5 mg/L or greater, which is the level of boron that causes or threatens to cause pollution, contamination, and/or nuisance; adversely impacts the environment; and/or causes or contributes to an exceedance of any applicable water quality standards. These discharges of boron from the Facility have violated Discharge Prohibitions III.A, III.B, III.C, and III.D and Receiving Water Limitations VI.A, VI.B, and VI.C of the General Permit and are evidence of ongoing violations of Effluent Limitation V.A of the General Permit.

76.     During the 2018-2019 reporting year, the levels of boron in storm water detected at the Facility exceeded 5 mg/L of boron.  On November 29, 2018, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 501 mg/L, 3,170 mg/L, 102 mg/L, and 13.9 mg/L, respectively. On December 5, 2018, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, D, and E at the Facility were 1,140 mg/L, 2,220 mg/L, 156 mg/L, 19.8 mg/L, and 423 mg/L, respectively. On January 7, 2019, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 664 mg/L, 1,780 mg/L, 379 mg/L, and 40.4 mg/L, respectively. On January 31, 2019, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, D, and E at the Facility were 362 mg/L, 1,330 mg/L, 46.3 mg/L, 55.2 mg/L, and 652 mg/L, respectively. The average of all boron

measurements in storm water samples at the Facility during the 2018-2019 reporting year was 701.5 mg/L. This average concentration of boron in storm water discharging to the Inner Harbor exceeds concentrations of boron that cause or threaten to cause pollution, contamination, and/or nuisance; adversely impact the environment; and/or cause or contribute to an exceedance of any applicable water quality standards.

77.     During the 2019-2020 reporting year, the levels of boron in storm water detected at the Facility exceeded 5 mg/L of boron. On November 20, 2019, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 711 mg/L, 3,850 mg/L, 498 mg/L, and 53 mg/L, respectively. On November 27, 2019, the levels of boron in storm water collected by the from Drainage Areas A, B, C, and D at the Facility were 946 mg/L, 3,670 mg/L, 235 mg/L, and 46.8 mg/L, respectively. On January 17, 2020, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 184 mg/L, 1,010 mg/L, 98.3 mg/L, and 10.3 mg/L, respectively. On March 10, 2020, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 216 mg/L, 790 mg/L, 130 mg/L, and 20 mg/L, respectively. On March 12, 2020, the level of boron in storm water collected by the Defendant from Drainage Area E at the Facility was 384 mg/L. The average of all boron measurements in storm water samples at the Facility during the 2019-2020 reporting year was 756 mg/L. This average concentration of boron in storm water discharging to the Inner Harbor exceeds concentrations of boron that cause or threaten to cause pollution, contamination, and/or nuisance; adversely impact the environment; and/or cause or contribute to an exceedance of any applicable water quality standards.

78.     During the 2020-2021 reporting year, the levels of boron in storm water detected at the Facility exceeded 5 mg/L of boron. On December 28, 2020, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1,380 mg/L, 2,820 mg/L, 128 mg/L, and 108 mg/L, respectively. On January 25, 2021, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 369 mg/L, 924 mg/L, 94.6 mg/L, and 20.7 mg/L, respectively. On January 28, 2021, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility 630 mg/L, 773 mg/L, 114 mg/L, and 18.1 mg/L, respectively. The average of all boron measurements in storm water samples at the Facility during the 2020-2021 reporting year was 614.95 mg/L. This average concentration of boron in storm water discharging to the Inner Harbor exceeds concentrations of boron that cause or threaten to cause pollution, contamination, and/or nuisance; adversely impact the environment; and/or cause or contribute to an exceedance of any applicable water quality standards.

79.     During the 2021-2022 reporting year, the levels of boron in storm water detected at the Facility exceeded 5 mg/L of boron. On December 14, 2021, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 1,160 mg/L, 781 mg/L, 153 mg/L, and 166 mg/L, respectively. On December 23, 2021, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 495 mg/L, 920 mg/L, 166 mg/L, and 18.4 mg/L, respectively. On March 28, 2022, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility

were 64.1 mg/L, 41.1 mg/L, 63.5 mg/L, and 14.1 mg/L, respectively. The average of all boron measurements in storm water samples at the Facility during the 2021-2022 reporting year was 336.85 mg/L. This average concentration of boron in storm water discharging to the Inner Harbor exceeds concentrations of boron that cause or threaten to cause pollution, contamination, and/or nuisance; adversely impact the environment; and/or cause or contribute to an exceedance of any applicable water quality standards.

80.     During the 2022-2023 reporting year, the levels of boron in storm water detected at the Facility have exceeded 5 mg/L of boron. On November 8, 2022, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 689 mg/L, 3,090 mg/L, 111 mg/L, and 25.2 mg/L, respectively. On December 11, 2022, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 719 mg/L, 1,120 mg/L, 84.3 mg/L, and 38 mg/L, respectively. On January 9, 2023, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 276 mg/L, 1,140 mg/L, 79 mg/L, and 185 mg/L, respectively. On January 30, 2023, the levels of boron in storm water collected by the Defendant from Drainage Areas A, B, C, and D at the Facility were 238 mg/L, 357 mg/L, 42.6 mg/L, and 7.5 mg/L, respectively. The average of all boron measurements in storm water at the Facility during the 2022-2023 reporting year to date is 512.6 mg/L. This average concentration of boron in storm water discharging to the Inner Harbor exceeds concentrations of boron that cause or threaten to cause pollution, contamination, and/or nuisance; adversely impact the environment; and/or cause or contribute to an exceedance of any applicable water quality standards.

81.     Plaintiff is informed and believes, and thereupon alleges, that during the last five rainy seasons and continuing through to the time of filing this Complaint, Defendant has discharged storm water from the Facility contaminated with zinc, N+N, iron, boron, and other pollutants well in excess of one or more applicable NALs, the zinc water quality standard, and high levels of boron in violation of Effluent Limitation V.A, Discharge Prohibitions III.A, III.B, III.C, and III.D, and Receiving Water Limitations VI.A, VI.B, and VI.C of the General Permit. Plaintiff is informed and believes, and thereupon alleges, that storm water discharges containing these pollutants in violation of the General Permit have also occurred from the Facility on other rain dates listed in Attachment A of Exhibit A.

82.     On information and belief, Plaintiff alleges that since at least March 18, 2018, Defendant has failed to implement BAT and BCT at the Facility for its discharges of zinc, N+N, iron, boron, and other pollutants. Effluent Limitation V.A of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992. The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id.* A facility's BMPs must, at all times, be robust enough to meet the

General Permit's and 33 U.S.C. § 1342(p)(3)(A)'s requirement that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit, §§ V.A, I.A.1, I.D.31-32. As of the date of this Complaint, Defendant has failed to implement advanced BMPs that achieve BAT and BCT.

83.     On information and belief, Plaintiff alleges that since at least March 18, 2018, Defendant has failed to implement an adequate SWPPP for the Facility. The Defendant's SWPPP, as amended in December 2016 and June 2020, fails to identify and describe advanced BMPs in violation of the General Permit. General Permit, § X.C.1.b. The SWPPP fails to identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for its exclusion. General Permit, § X.H.4.b.

84.     Plaintiff is informed and believes, and thereupon alleges, that at least since June 15, 2020, Defendant has failed to assess the Facility's BMPs and to revise its SWPPP within 90 days of conducting the Annual Evaluation for the 2021-2022 reporting year, during which the Facility's sampling results indicated NAL exceedances for zinc, N+N, and iron and high levels of boron. The Facility's Annual Report for the 2021-2022 reporting year does not identify any revisions made to the SWPPP despite NAL exceedances for zinc, N+N, and iron and the reported levels of boron. The Annual Report for the 2021-2022 reporting year fails to provide a sufficient explanation of the Facility's failure to take steps to reduce or prevent high levels of pollutants, including but not limited to, for zinc, N+N, and iron, which were measured at levels in the Facility's storm water above the annual NALs, and for boron, which were measured at levels in the Facility's storm water that cause or

threaten to cause pollution, contamination, and/or nuisance; adversely impact the environment; and/ or cause or contribute to an exceedance of any applicable water quality standards. Defendant's failure to assess the Facility's BMPs and to report revisions to the SWPPP negates a key component of the evaluation process required in self-monitoring programs such as the General Permit.

85.     Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the Facility during rain events into storm drains at the Facility that empty into the East Basin Channel of the Inner Harbor, which then flows into the Outer Harbor and ultimately flows to the Pacific Ocean.

86.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and Best Conventional Treatment Technologies in Violation of Permit Conditions and the Act**
**33 U.S.C. §§ 1311, 1342**

87.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

88.     The General Permit's SWPPP requirements and Effluent Limitation V.A require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement advanced BMPs, and BAT and BCT at the Facility for their discharges of zinc, N+N, iron, boron, and other potentially un-monitored pollutants in violation of Effluent Limitations V.A and X.H of the General Permit.

89.     Each day since March 18, 2018, that Defendant has failed to develop and implement advanced BMPs and BAT/ BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

90.     Defendant has been in violation of the BMP and BAT/BCT requirements every day since at least March 18, 2018. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update an Adequate Storm Water Pollution Prevention Plan in Violation of Permit Conditions and the Act 33 U.S.C. §§ 1311, 1342**

91.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

92.     Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

93.     Defendant has failed to develop and implement an adequate SWPPP for

the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's failure to identify and describe advance BMPs at the Facility.

94.     Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring as required by Sections XV and XVI of the General Permit.

95.     Each day since March 18, 2018, that Defendant has failed to develop, implement, and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

96.     Defendant has been in violation of the Permit's SWPPP requirements every day since March 18, 2018. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**THIRD CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**33 U.S.C. §§ 1311, 1342**

97.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

98.     Receiving Water Limitation VI.C and Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the General Permit prohibits storm water

discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

99.     Plaintiff is informed and believes, and thereupon alleges, that since at least March 18, 2018, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for zinc and boron in violation of Receiving Water Limitations VI.A, VI.B, and VI.C, and Discharge Prohibition III.C and III.D of the General Permit.

100.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with zinc and boron and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water from the Facility flows into storm drains at the Facility. Plaintiff is informed and believes, and thereupon alleges, that storm water from the Facility flows through storm drains into the East Basin Channel of the Inner Harbor, which then flows into the Outer Harbor and ultimately flows to the Pacific Ocean.

101.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

102.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water cause or threaten to cause pollution, contamination, or nuisance in violation of Receiving Water Limitation VI.C and Discharge Prohibition III.C of the General Permit.

103.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.B of the General Permit.

104.   Plaintiff is informed and believes, and thereupon alleges, that unauthorized non-stormwater discharges have been occurring at the Facility as a result of inadequate BMPs to prevent non-storm water discharges.

105.   Every day since at least March 18, 2018 that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order Defendant to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.  Order Defendant to pay civil penalties of up to $64,618 per day per violation;

i.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

///

///

///

///

k.  Award any such other and further relief as this Court may deem appropriate.

Dated: May 17, 2023                Respectfully submitted,


                                   By:    /s/ *Michael R. Lozeau*
                                          Michael R. Lozeau
                                          Victoria A. Yundt
                                          LOZEAU DRURY LLP
                                          Attorneys for Los Angeles Waterkeeper